IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

VICTORIA P. KING,                                    )          CASE NO.  5:16-cv-00001
                                                     )
              Plaintiff,                             )          MAGISTRATE JUDGE
                                                     )          KATHLEEN B. BURKE
       v.                                            )
                                                     )
COMMISSIONER OF SOCIAL                               )
SECURITY,                                            )
                                                     )          **MEMORANDUM OPINION & ORDER**
              Defendant.                             )


       Plaintiff Victoria P. King ("Plaintiff" or "King") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for Supplemental Security Income ("SSI") benefits.  Doc. 1.  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 14.   As explained more fully below, the Court

**AFFIRMS** the Commissioner's decision.

## I.  Procedural History

       King protectively filed an application for Supplemental Security Income ("SSI") on June

19, 2012.[1]  Tr. 15, 148-153.   She alleged a disability onset date of January 1, 2010 (Tr. 15, 148,

215), and alleged disability due to high blood pressure, heart murmur, severe asthma, learning

disability, depression, hearing loss, and speech problems (Tr. 99, 113, 167).[2]   King's application

was denied initially and upon reconsideration by the state agency.  Tr. 99-109, 113-117.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about
filing for benefits. It may be used to establish an earlier application date than when we receive your signed
application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 2/1/2017).

[2] During the administrative hearing, King also relayed having a knee problem that had arisen in April 2014.  Tr. 34-
35.

Thereafter, she requested an administrative hearing.  Tr. 118-120.   On June 4, 2014, Administrative Law Judge Paula J. Goodrich ("ALJ") conducted an administrative hearing.  Tr. 30-64.

In her June 23, 2014, decision, the ALJ determined that King had not been under a disability since June 19, 2012, the date the application was filed.  Tr. 12-29.  King requested review of the ALJ's decision by the Appeals Council.  Tr. 10-11.  On November 19, 2015, the Appeals Council denied King's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.      Personal, educational and vocational evidence

King was born in 1961 and was 52 years old at the time of the hearing.  Tr. 22, 33, 37, 148, 215.  King completed school through the 12th grade.  Tr. 38, 168.   King indicated at the hearing that she attended special education classes.  Tr. 38-39, 168.   King's past work involved working on an assembly line, packaging light bulbs.  Tr. 39.  She was placed at that job through Minute Men on more than one occasion.  Tr. 39-40.  King raised her three children by herself.  Tr. 56, 59.  She did not work while raising her children; she received public assistance.  Tr. 57.  At the time of the hearing, King's children were adults (ages 28, 23 and 18) and King was living with her four minor grandchildren and her daughter.  Tr. 44, 59.

### B.      Medical evidence

#### 1.      Treatment history

##### a.      Physical impairments

King's primary care physician was Dr. James L. Johnston, Sr., D.O.  Doc. 15, p. 2; Tr. 362.  On August 18, 2009, King saw Dr. Johnston following a fall on her left knee that resulted

in an emergency room visit.  Tr. 362.  Dr. Johnston noted that x-rays pertaining to the fall were negative.  Tr. 362.  Dr. Johnston also noted that King had a history of hypertension, non-insulin dependent diabetes, hyperlipidemia, allergies, and asthma.  Tr. 362.  King complained of knee pain.  Tr. 362.  Dr. Johnston's physical examination revealed that King had negative crepitus, negative McMurray's,[3] and positive effusion.  Tr. 362.  Dr. Johnston recommended that King ice her knee, he prescribed ibuprofen and he ordered full lab work.  Tr. 362.  King was advised to follow up if she had any further problems with her knee and Dr. Johnston's office would call King if there were abnormalities with her lab work.  Tr. 362.

King saw Dr. Johnston in January and April of 2010 for follow up regarding her non-insulin dependent diabetes, asthma, hypertension, hyperlipidemia, and allergies.  Tr. 333, 334.[4] During both visits, King denied muscle or joint pain.  Tr. 333, 334.  King saw Dr. Johnston in April 2011 for a lesion on the right side of her nose, hypertension, and cough.  Tr. 331-332.  Dr. Johnston assessed asthma, unspecified status; unspecified essential hypertension; diabetes mellitus without mention of complication, type II or unspecified type; and allergic rhinitis, cause unspecified.  Tr. 331.  Dr. Johnston provided King with prescriptions for her asthma.  Tr. 331. During an October 18, 2011, visit with Dr. Johnston for possible scabies, Dr. Johnston noted that King's compliance with her medical regimen for her diabetes, hypercholesterolemia, and hypertension was fair. Tr. 327-329.  King's physical examination results were generally normal with some rales and wheezing noted.  Tr. 328.  King saw Dr. Johnston again in December 2011 complaining of a cough for one month.  Tr. 316-317.  Dr. Johnston again noted that King's compliance with her medical regimen for her diabetes, hypercholesterolemia, and hypertension

---

[3] McMurray's is used to test for a tear of the medial meniscus of the knee joint.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1894.

[4] The treatment notes from King's January and April visits with Dr. Johnston are also located in the administrative record at Tr. 356, 359.

3

was fair. Tr. 316.   King's respiratory examination revealed a cough but clear auscultation

bilaterally.  Tr. 316.   Also, Dr. Johnston's examination revealed a thyroid nodule.  Tr. 316.  Dr.

Johnston recommended humidification for King's asthma and thyroid lab work.  Tr. 316.

In June 2012, King saw Dr. Johnston for a follow-up visit and she also complained of a

cough.  Tr. 314-315.  King's physical examination was generally normal with a note that King

had rales and wheezes bilaterally, worse on the right than left.  Tr. 314-315.  Dr. Johnston

recommended that King start using a nebulizer device.  Tr. 315.  In September 2012, King saw

Dr. Johnston with complaints of swollen ankles and feet.  Tr. 413.  Dr. Johnston noted that

King's compliance with her medical regimen for diabetes mellitus and hypercholesterolemia was

fair.  Tr. 413.  King's physical examination was generally normal with a note that King had

cellulitis of the nose.  Tr. 414.  Dr. Johnston recommended that King start a blood pressure

monitor kit, continue with humidification, and follow up as necessary.  Tr.  414.   Upon referral

by Dr. Johnston, on December 17, 2012, King underwent a lower extremity venous duplex study

of the left lower extremity due to pain in the limb.  Tr. 411.  The study was negative for acute

deep vein thrombosis of the left lower extremity.  Tr. 411.

King continued to see Dr. Johnston in 2013 for refills on her medications.  Tr. 408-410,

436-437.  King's compliance with her medical regimen continued to be fair and physical

examination findings were generally normal.[5]  Tr. 409, 436-437.  In March 2014, King saw Dr.

Johnston for a follow-up appointment.  Tr. 481-482.  King's compliance with her medical

regimen continued to be fair.  Tr. 481.  With the exception of bilateral wheezes and a cough,

King's physical examination findings were normal.  Tr. 481.  Dr. Johnston started King on a

dose of prednisone and advised King to follow up as necessary.  Tr. 482.   The following month,

on April 21, 2014, King saw Dr. Johnston with complaints of a cough and knee pain.  Tr. 485-

_____

[5] During a January 14, 2013, visit, Dr. Johnston again observed cellulitis of the nose.  Tr. 409.

486.  On physical examination, Dr. Johnston observed that King's lungs were clear to auscultation.  Tr. 486.   In King's right knee, Dr. Johnston observed pain, swelling, a positive McMurray's test, and crepitus.  Tr.  486.  On May 13, 2014, an x-ray was taken of King's right knee.  Tr. 487.  The x-ray showed "[s]ignificant moderate to advanced medial compartment and mild patellofemoral compartment joint space narrowing.  Trace medial compartment tibial osteoarthropathy.  No evidence of fracture, subluxation, or joint effusion."  Tr. 487.  On May 28, 2014, an MRI was taken of King's right knee.  Tr. 232-233.   The MRI showed "[l]imited characterization of the medial meniscus given patient motion without evidence of longitudinal tear of the extruded body of the medial meniscus."  Tr. 233.   However, it was noted that "a subtle partial thickness tibial surface tear about the anterior body junction of the medical meniscus is not excluded."  Tr. 233.  The MRI also showed "[t]ricompartmental osteoarthritis with moderate medial femorotibial arthrosis" and "[e]dema about the medial knee joint line in particular extending inferior to the medial knee joint line."  Tr. 233.

King underwent a physical therapy evaluation on May 13, 2014.  Tr. 507-513.  The physical therapist observed a stiff knee gait, noting that King ambulated with little to no right knee flexion and had a decreased stance on her right leg.  Tr. 508.  The physical therapist also noted that, when ascending and descending stairs, King exhibited marked antalgia and her right knee did not have good control with eccentric lowering to the stair.  Tr. 508.  Performing the McMurray test and Patellar Grind test aggravated King's symptoms.  Tr. 509.  The physical therapist determined that King required skilled physical therapy in conjunction with a home exercise program to address her right knee pain.  Tr. 509.  King attended physical therapy on May 16, 20, 27, and 29 and June 3.  Tr. 490-492, 493-495, 496-499, 501-503, 504-506.  During her May 16 and May 20, it was noted that King tolerated the treatment/therapeutic activity with

mild complaints of pain and difficulty.  Tr. 503, 506.  During her May 27, 2014, visit, it was

noted that King had some improvement in her strength and range of motion and she was

ambulating better with stance on the right and more knee flexion.  Tr. 498.  During her May 29,

2014, visit, it was noted that King tolerated treatment/therapeutic therapy without complaints of

pain or difficulty.  Tr. 495.  On June 3, 2014, it was again noted that King tolerated

treatment/therapeutic therapy without complaints of pain or difficulty. Tr. 492.  However, it was

also noted that King was continuing to report a high pain level with no improvement in

functional mobility.  Tr.492.  The physical therapist recommended that King discuss her lack of

progress in therapy with her physician, with physical therapy to proceed as tolerated.  Tr. 492.

Thereafter, King cancelled physical therapy appointments on June 6, 2014, and June 10, 2014,

per doctor.  Tr. 488-489.

### b.    Mental impairments

On July 2, 2012, King sought mental health counseling at Greenleaf Family Center

stating that she was stressed and had no one to talk to.  Tr. 336-341.  Morgan Schumacher, P.C.,

completed a diagnostic assessment.  Tr. 336-341.  King reported that she was living with her two

daughters and one of her daughter's daughters.  Tr. 336.  Ms. Schumacher noted that King's

major presenting problems were depression and family problems.  Tr. 336.  Ms. Schumacher's

mental status exam included the following findings: King's appearance was appropriate; her

behavior was within normal limits and she was cooperative; her intellectual functioning, thought

content, thought processes, perceptions, and speech were within normal limits; her affect/mood

was happy/euthymic and sad/dysthymic, with a notation that her affect/mood was appropriate for

content; and she had infrequent suicidal ideation and had no homicidality.  Tr. 336-337.  With

respect to King's general functioning, Ms. Schumacher observed impaired interpersonal

boundaries and reduced ability to provide for own basic needs/safety, with a notation that King was living with her daughters and grandchildren, struggled with her relationship with her father, and was unemployed.  Tr. 337.  Ms. Schumacher found that King's insight was poor and her judgment was fair.  Tr. 337.  Ms. Schumacher diagnosed King with adjustment disorder with depressed mood; parent child relationship problems; adjustment disorder with mixed anxiety and depressed mood; and dysthymic disorder.  Tr. 340.  King continued treatment at Greenleaf until February 26, 2013.  Tr. 449, 450-466.  Her treatment relationship with Greenleaf was terminated on August 13, 2013.  Tr. 449.  The Greenleaf termination summary reflected that King had dropped out of treatment, with no contact for three months.  Tr. 449.  King's counselor reported that King had shown improvement, which was evidenced by King returning to church, enjoying time with her grandchildren, and getting her teeth repaired.  Tr. 449.

In February 2013, King started counseling through Portage Path Behavioral Health.  Tr. 443-448.  Initial diagnoses included major depressive disorder, recurrent moderate; generalized anxiety disorder; alcohol dependence; and borderline intellectual functioning.  Tr. 445.  On April 30, 2013, King was seen at Portage Path.  Tr. 439.  She reported that she had stopped taking the Zoloft that had been prescribed because she had heard that the generic version of the medication had been recalled.  Tr. 439.  King's therapist encouraged her to speak with her prescribing physician regarding not taking the medication.  Tr. 439.  Her therapist noted that King had "borderline intellectual functioning [and was] very concrete and limited in her thinking."  Tr. 439.  During an August 21, 2013, medication follow-up visit at Portage Path, King relayed that, when she was not taking Zoloft, her depression and anxiety returned.  Tr. 475.  As of the end of July, she was not taking Zoloft.  Tr. 474.  King was restarted on Zoloft.  Tr. 475.  In response to a request for information regarding King's treatment at Portage Path, it was reported that King

had seen her therapist at Portage Path only three times between February 2013 and February 2014.  Tr.  476.

### 2.     Medical opinion evidence

#### a.     Physical impairments

##### *Consultative examining physician*

On October 18, 2012, King saw Yolanda Duncan, M.D., for a consultative physical examination.  Tr. 394-407.  King explained to Dr. Duncan that she had been diagnosed with asthma about two years earlier; she has difficulty walking more than 2 blocks due to shortness of breath; she can only stand for about 10 minutes because of pain in her knees; she can sit for about 20 minutes; she can climb 1 flight of stairs; and she is able to carry less than 10 pounds.  Tr. 399.  On physical examination, Dr. Duncan observed that King had a normal gait and used no ambulatory aids when traveling from the waiting room to the examination room.  Tr. 400.  Dr. Duncan observed that King was slightly hard of hearing such that Dr. Duncan had to speak in a louder than normal conversational tone in order for King to hear her.  Tr. 400.  King's speech was normal.  Tr. 400.  King's lungs were clear to auscultation bilaterally with no wheezes, crackles or rhonchi.  Tr. 400.  King had a full range of motion in all extremities.  Tr. 400.  King's joints appeared to be clinically normal with no sign of enlargement, thickening, effusion, swelling, tenderness, heat, or redness and there was no deformity or instability noted.  Tr. 400.

Pulmonary function studies were performed.  Tr. 402-407.  The technician observed that King was coughing before and after the testing (Tr. 404) but King did not feel that her breathing was substantially worse than usual (Tr. 402).  King's spirometry results were as follows: Forced Vital Capacity (FVC)[6] Liters – 1.34 and 1 Second Vital Capacity (FEV1)[7]  Liters – 1.02.  Tr.

---

[6] FVC means "forced vital capacity."  20 C.F.R. pt. 404, subpt. P, App. 1, pt. A1, § 3.00(C)(11).

405.  Dr. Duncan concluded that King's testing showed that King had a "good understanding and suboptimal effort."  Tr. 405.  Also, Dr. Duncan indicated there was "good reproducibility" and "modsevere restriction."  Tr. 405.

Dr. Duncan's assessment was that King had the following conditions: asthma, hypertension, type II diabetes, knee pain, and hard of hearing.  Tr. 401.  Dr. Duncan opined that King:

> [S]hould not have difficulty with work-related physical activities such as walking up to 2 blocks, sitting up to 20 minutes, [and] walking up to 1 flight of stairs.  She may have difficulty with standing longer than 10 minutes.  Hearing is slightly impaired.  Speech is normal.  [King] should not have any difficulty traveling or following commands.  From my observation, should she receive benefits, she should be able to manage these in her own best interest.

Tr. 401.

### *State agency reviewing physicians*

On November 24, 2011, state agency reviewing physician Olga V. Pylaeva, M.D., completed a physical RFC assessment.  Tr. 74-75.  Dr. Pylaeva opined that King had the following exertional limitations: lift and/or carry 20 pounds occasionally, lift and/or carry 10 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, sit more than 6 hours on a sustained basis in an 8-hour workday, and push and/or pull unlimitedly (other than as shown for lift and/or carry).  Tr. 74-75.  Dr. Pylaeva opined that King had no postural, manipulative, visual, or communicative limitations but King had the following environmental limitations: avoid concentrated exposure to extreme cold, extreme heat, and fumes, odors, dusts, gases, poor ventilation, etc.  Tr. 75.  Dr. Pylaeva explained that the limitations included in the physical RFC assessment were based on King's asthma.  Tr. 75.

---

[7] FEV1 means "forced expiratory volume in the first second of a forced expiratory maneuver."  20 C.F.R. pt. 404, subpt. P, pt. A1, § Listing 3.00(C)(10).

Upon reconsideration, on December 30, 2012, state agency reviewing physician Jan Gorniak, D.O., completed a physical RFC assessment.  Tr. 88-90.  Like Dr. Pylaeva, Dr. Gorniak opined that King had the following exertional limitations: lift and/or carry 20 pounds occasionally, lift and/or carry 10 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, sit more than 6 hours on a sustained basis in an 8-hour workday, and push and/or pull unlimitedly (other than as shown for lift and/or carry).  Tr. 88.  Dr. Gorniak opined that King had no postural, manipulative or visual limitations but she had communicative limitations and environmental limitations.  Tr. 88-89.   As for the communicative limitations, Dr. Gorniak opined that, due to King being slightly hard of hearing, she should avoid environments with loud background noises.  Tr. 89.  As for the environmental limitations, Dr. Gorniak opined that King would need to avoid concentrated exposures to extreme cold, extreme heat, humidity, noise, and fumes, odors, dusts, gases, poor ventilation, etc.  Tr. 89.  Dr. Gorniak explained the limitations in the RFC, noting King's asthma, hypertension, diabetes, and knee pain, and that she was hard of hearing.  Tr. 88.  Dr. Gorniak further explained that the consultative examining physician's evaluation revealed a normal examination (normal gait, full range of motion in all joints, lungs clear to auscultation, corrected visual acuity 20/40 in both eyes); King was slightly hard of hearing; and pulmonary function studies showed moderate severe restrictions with good understanding, suboptimal effort, and good reproducibility.  Tr. 88-89.

### b.    Mental impairments

#### *Consultative examining psychologist*

On October 3, 2012, King saw Sudhir Dubey, Psy.D., for a consultative psychological examination.  Tr. 384-393.  Dr. Dubey administered the Wechsler Adult Intelligence Scale – 4th Edition (WAIS-IV) to assess King's intellectual capabilities.  Tr. 385.  King's tests results were:

Verbal Comprehension Index Score ("VCI") – 70; Perceptual Reasoning Index Score ("PRI") – 77; Working Memory Index Score ("WMI") – 66; Processing Speed Index Score ("PSI") – 71; and Full Scale IQ Score ("FSIQ") – 66.  Tr. 385.  Dr. Dubey opined that the results were an underestimate of King's FSIQ score.  Tr. 385.  In support of this opinion, Dr. Dubey cited an apparently poor effort, performance on the other indices; and reported overall level of functioning.  Tr. 385.  Dr. Dubey opined that, based on all the available information, King's overall FSIQ functioning is more likely in the borderline range.  Tr. 385.

When discussing her past work history, King relayed to Dr. Dubey that her physical health problems impacted her ability to find a job.  Tr. 387.  She indicated that she was able to meet the mental requirements associated with work. Tr. 387.   With respect to King's flow of conversation and thought processes, Dr. Dubey observed that King did not need simple directions or simple questions repeated.  Tr. 388.  King did need multi-step directions and multi-part questions repeated; she appeared to have mild comprehension problems; and additional explanations of a few words or phrases were needed.  Tr. 388.  King reported some problems in the past with concentrating and remembering.  Tr. 388.  Dr. Dubey did not observe concentration problems.  Tr. 388.  He opined that, based on all available information, King's level of cognitive functioning at the time was estimated to be in the borderline range.  Tr. 388.

Dr. Dubey found that King's "self-reported history and information provided [was] consistent with the records provided for review" but her "self-report and general interactional style was internally inconsistent and exaggerating the conditions with the information she provided during the interview."  Tr. 389.  As an example, Dr. Dubey explained that King "appeared to be magnifying reported symptoms, by reporting attention, concentration and

memory problems when none were observed." Tr. 389.   Also, Dr. Dubey indicated that King claimed to have speech and hearing problems but none were observed.  Tr. 389.

Dr. Dubey's diagnoses were depressive disorder, NOS, and borderline intellectual functioning.  Tr. 390.  He assessed a GAF score of 65.[8]  Tr. 390.

Regarding King's functional abilities, Dr. Dubey opined that King (1) would be able to understand, remember, and carry out simple instructions, such as one-step processes and she would be able to understand, remember, and carry out multi-step instructions; (2) would be able to maintain persistence and pace to remember and carry out simple instructions and multi-step instructions; (3) would not have issues dealing with co-workers and supervisors; and (4) would not have issues dealing with work pressure.  Tr. 390-391.

### State agency reviewing psychologists

On November 21, 2012, state agency reviewing psychologist Kristen Haskins, Psy. D., completed a Psychiatric Review Technique ("PRT") (Tr. 72-73) and a mental RFC assessment (Tr. 75-77).   In the PRT, Dr. Haskins opined that King had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  Tr. 73.  There were no repeated episodes of decompensation of extended duration.  Tr. 73.  In the mental RFC assessment, Dr. Haskins rated

---

[8] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*  With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

King's limitations in the areas of understanding and memory; concentration and persistence; social interaction; and adaptation.  Tr. 76-77.

With respect to understanding and memory limitations, Dr. Haskins opined that King was moderately limited in her ability to understand and remember detailed instructions.  Tr. 76.  She explained further that King had low IQ scores and appeared to be functioning in the borderline range but retained the ability to perform simple, routine tasks.  Tr. 76.  With respect to concentration and persistence limitations, Dr. Haskins opined that King was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 76.  Dr. Haskins explained further that King did demonstrate some difficulty with concentration at the consultative examination but she could perform static tasks without strict demands on production or pace.  Tr. 77.  Dr. Haskins opined that there was no evidence of limitation and/or King was not significantly limited in the area of social interaction.  Tr. 77.  With respect to adaptation limitations, Dr. Haskins opined that King was moderately limited in her ability to respond appropriately to changes in the work setting and explained that King should be limited to a static setting.  Tr. 77.

Upon reconsideration, on January 2, 2013, state agency reviewing psychologist Aracelis Rivera, Psy.D., completed a PRT (Tr. 86-87) and mental RFC assessment (Tr. 90-92).  Dr. Rivera reached the same conclusions as Dr. Haskins regarding King's limitations due to her mental impairments.  Tr. 86-87, 90-92.

**C.    Testimonial evidence**

**1.    Plaintiff's testimony**

King was represented and testified at the hearing.  Tr. 36-51, 56-59.

King stated she was prevented from or felt that she was unable to work because of her diabetes and asthma and she recently learned that she had a torn ligament in her knee.  Tr. 41.

Regarding her knee, King did not have a fall – her knee just started hurting.  Tr. 42.  King was going to therapy for her knee but, following an MRI, her doctors recommended that she stop going to therapy until King saw a specialist.  Tr. 41, 50-51.  King was waiting on a call from the specialist to schedule an appointment.  Tr. 41.  King's doctor prescribed and she was taking ibuprofen for the pain.  Tr. 41-42.  King had been having problems with her knee for about two months.  Tr. 42.  She had been using a cane for about two weeks because her knee gives out and hurts a lot and it is hard for her to walk.  Tr. 49.  King's doctors did not prescribe the cane – her grandmother gave it to her.  Tr. 48-49.

King started having problems with her breathing over a year before the hearing.  Tr. 46.  She takes medication for her asthma and indicated that the medication helps.  Tr. 42.   King did not require emergency room treatment for her asthma in the last couple years.  Tr. 42.  Working in the heat causes King problems with respect to her asthma.  Tr. 42.

King has received treatment for depression and anxiety and takes medication that helps with the symptoms from those impairments.  Tr. 43.  King could not say whether or not she thought her anxiety and depression would interfere with her ability to work.  Tr. 43.

King has never driven.  Tr. 37-38.  She receives rides from other people or uses public transportation.  Tr. 38.  King's youngest grandchild is a newborn.  Tr. 45.  King's daughter

stopped working when she had her youngest child. Tr. 45.  King helps her daughter take care of the children.  Tr. 45.  Before King's youngest grandchild was born, King's daughter worked and King was taking care of the children all day.  Tr. 45.  King's school-age grandchildren take the bus to school.  Tr. 45.  King's daughter takes the children to the bus.  Tr. 46.  King does a limited amount of household chores.  Tr. 45.  King's daughter does most of the cooking.  Tr. 45.  King's daughter does the laundry for the children.  Tr. 46.  King sometimes does her own laundry.  Tr. 46.  While the children are at school, King stated she is lonely and sits and watches television.  Tr. 46.  King also reads the Bible.  Tr. 47.  She can understand what she is reading.  Tr. 47.  King is not good at math.  Tr. 47.  She is unable to help her grandchildren with their homework because she does not understand most of it.  Tr. 47-48.  She does not read to her grandchildren but would be able to.  Tr. 48.  When King watches television, she usually sits on the couch with her feet up.  Tr. 49.  She can sit for at least 10 minutes without her feet up.  Tr. 49.  King takes walks but can only walk around a building.  Tr. 49.  King thinks she could lift a 10-pound bag of potatoes but not two 10-pound bags.  Tr. 49-50.

## 2. Vocational Expert's testimony

Vocational Expert ("VE") Gene Burkhammer testified at the hearing.  Tr.  51-56, 60-62.  The VE also prepared a 15-year work summary regarding King's past work, indicating that King had worked as a production assembler, an unskilled, light exertional job.  Tr. 53, 231.

The ALJ asked the VE to assume a hypothetical individual of King's age and with her education and past work experience who was limited to sedentary work.  Tr.  53.  The ALJ then asked the VE whether that hypothetical individual would be able to perform King's past work and the VE's response was no.  Tr. 53.

For her second hypothetical, the ALJ asked the VE whether an individual who could lift and/or carry, including upper pulling, 20 pounds; frequently lift and/or carry, including upper pulling, 10 pounds; stand and/or walk with normal breaks for about six hours in an eight-hour workday; sit with normal breaks for about six hours in an eight-hour workday; unlimited pushing and pulling, other than as shown for lifting or carrying; can tolerate moderate or below noise intensity level; should avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dust, gases, poor ventilation, etc.; has no postural, manipulative or visual limitations; is limited to unskilled work that involves simple, routine tasks in a static work setting, meaning a workplace with infrequent changes; and can have no tasks with high production demands, or quotas or with demands for fast pace, such as you would find in assembly line production but can perform goal oriented work, such as you find in office cleaning.  Tr. 54-55.  The VE indicated that there would be jobs that the described individual could perform, including (1) housekeeping cleaner, a light, unskilled job; (2) sales attendant, a light, unskilled job; and (3) food service worker, a light, unskilled job.[9]  Tr. 55-56.

King's counsel asked the VE whether there would be jobs available if the individual was required to avoid all exposure to dust and have limited exposure to gases, odors, and fumes.  Tr. 60-61.  The VE indicated that that modification to the hypothetical might reduce the job incidence numbers in half but there would still be a significant number in the economy.  Tr. 61-62.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

---

[9] The VE provided national, state and regional job incidence numbers for each of the identified jobs.  Tr. 55.

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[10] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[11] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

---

[10] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[11] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her June 23, 2014, decision, the ALJ made the following findings:[12]

1.  King had not engaged in substantial gainful activity since June 19, 2012, the application date. Tr. 17.

2.  King had the following severe impairments: asthma; obesity; depressive disorder, recurrent, moderate; generalized anxiety disorder; and borderline intellectual functioning. Tr. 17. Other impairments alleged in the record, including the alleged knee impairment, were non-severe. Tr. 17, 22.

3.  King did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 17-19.

4.  King had the RFC to perform light work except she can tolerate moderate or below noise intensity level; must avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation; no postural, manipulative, or visual limitations; limited unskilled work; simple routine tasks in a static setting (i.e. as infrequent work place changes); no tasks with high production demands/quotas or with demand for fast pace (e.g. assembly line production) but can perform goal oriented work (e.g. office cleaner). Tr. 19-22.

5.  King was unable to perform past relevant work. Tr. 22.

6.  King was born in 1961 and was 50 years old on the date the application was filed. Tr. 22.

7.  King had at least a high school education and was able to communicate in English. Tr. 22.

---

[12] The ALJ's findings are summarized.

8.    Transferability of job skills was not an issue because King's past relevant work was unskilled.  Tr. 22.

9.    Considering King's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that King could perform, including housekeeping cleaner, sales attendant, and food service worker.  Tr. 22-23.

Based on the foregoing, the ALJ determined that King had not been under a disability since June 19, 2012, the date the application was filed.  Tr. 23.

### V. Parties' Arguments

King argues that (1) the ALJ erred at Step Two when she did not find a severe impairment related to King's knee (Doc. 15, pp. 8-10; Doc. 19); (2) the ALJ did not properly evaluate her asthma and intellectual disability at Step Three (Doc. 15, pp. 10-12; Doc. 19); (3) the ALJ did not properly evaluate her credibility (Doc. 15, pp. 12-14; Doc. 19); and (4) the ALJ erred at Step Five because the ALJ should have relied upon the VE's response to a hypothetical question that included a sedentary limitation (Doc. 15, pp. 14-16; Doc. 19).

In response, the Commissioner argues the ALJ properly considered King's knee impairment and, since the ALJ found other severe impairments at Step Two and considered King's knee impairment at later steps in the sequential evaluation process, error, if any, at Step Two is harmless.  Doc. 18, pp. 6-9.  With respect to King's Step Three arguments, the Commissioner asserts that the ALJ properly determined that King's respiratory ailments did not satisfy a Listing; the ALJ reasonably concluded that King had borderline intellectual functioning, not intellectual disability, and that King did not meet Listing 12.05; and the ALJ properly considered the opinions of the state agency reviewing psychologists.  Doc. 18, pp. 9-16.  The Commissioner contends that the ALJ reasonably assessed King's credibility.  Doc. 18, pp. 17-18. The Commissioner argues that no error occurred at Step Five because the ALJ's RFC limitation

of light work is supported by substantial evidence and therefore the ALJ did not err in not relying on the VE's response to a hypothetical question that included a sedentary work limitation.  Doc. 18, p. 18.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## A.    The ALJ did not err at Step Two

King argues that the ALJ erred at Step Two when she did not find a severe impairment related to King's knee.  Doc. 15, pp. 8-10; Doc. 19.

At Step Two, the ALJ found King had the following severe impairments: asthma;

obesity; depressive disorder, recurrent, moderate; generalized anxiety disorder; and borderline

intellectual functioning.  Tr. 17.  The ALJ also found that other impairments, including King's

knee impairment, were non-severe, stating:

> All other impairments alleged in the record are considered "non-severe" because they do not pose more than minimal limitations upon the claimant's ability to perform work-related activity or have not met the duration requirement.  I considered the evidence submitted after the hearing regarding the claimant's alleged knee impairment, again, it does not meet the duration requirement and with treatment is expected to resolve within 12 months (See Exhibit 18F).

Tr. 17; *see also* Tr. 22 (indicating there is no severe knee impairment).

At Step Two, a claimant must show that she suffers from a severe medically determinable

physical or mental impairment that meets the duration requirement in 20 C.F.R. § 416.909,[13] or a

combination of impairments that is severe and meets the duration requirement.  20 C.F.R. §

416.920(a)(4)(ii).  It is King's burden to show the severity of her impairments.  *Foster v. Sec'y of*

*Health & Human Svcs.,* 899 F.2d 1221, *2 (6th Cir. 1990) (unpublished) (citing *Murphy v. Sec'y*

*of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986).  An impairment is not considered

severe when it does not significantly limit the claimant's physical or mental ability to do basic

work activities (without considering the claimant's age, education, or work experience).[14]  *Long*

*v. Apfel*, 1 Fed. Appx. 326, 330-332 (6th Cir. 2001); 20 C.F.R § 404.1521(a).

The Sixth Circuit has construed Step Two as a *de minimis* hurdle such that "an

impairment can be considered not severe only if it is a slight abnormality that minimally affects

---

[13] The duration requirement provides that "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 416.909.

[14] Basic work activities are defined by the regulations as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 416.921(b).  Examples, include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) the capacity to see, hear and speak; (3) the ability to understand, carry out, and remember simple instructions; (4) use of judgment; (5) ability to respond appropriately to supervision, co-workers, and usual work situations; and (6) the ability to deal with changes in a routine work setting.  *Id.*

work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  However, as noted by the *Higgs* court, a diagnosis alone "says nothing about the severity of the condition." *Id.* at 863.

Additionally, where an ALJ finds one severe impairment and continues with subsequent steps in the sequential evaluation process, error, if any, at Step Two may not warrant reversal. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the Commissioner's failure to find claimant's cervical condition severe was not reversible error because the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process)*; see also Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008) (relying on *Maziarz* when finding that, because the ALJ had found other impairments severe, the fact that some other impairments were found to be non-severe at Step Two was not reversible error).

King challenges the ALJ's Step Two finding that King's knee impairment was not a severe impairment because it was not expected to last 12 months.  Doc. 15, p. 9.  King claims that there is evidence showing that she related her knee problems to medical professional more than 12 months prior to the date of the hearing decision.  *Id.*  As an example, she points to Dr. Duncan's consultative examination dated October 2012.  *Id.*  She argues that the ALJ disregarded Dr. Duncan's report.  *Id.*  The ALJ did not disregard Dr. Duncan's report.  Tr. 20. The decision makes clear that the ALJ considered and weighed Dr. Duncan's opinion, giving it little weight, finding that the opinion relied heavily on King's subjective complaints in formulating functional limitations, which the ALJ found were not supported by the overall record, and finding that Dr. Duncan's opinion was "a glaring overestimate of the severity of [King's] restrictions."  Tr. 20.

Even if King could demonstrate error with respect to the ALJ's finding that King's knee impairment did not meet the duration requirement and was not severe, the ALJ found that King had severe impairments at Step Two and proceeded with subsequent steps in the sequential analysis.  Further, it is clear that the ALJ considered King's allegations regarding her knee impairment at both Step Two and throughout the sequential evaluation process.  Tr.  17, 19, 20, 22.  For example, at Step Two, the ALJ made clear that she considered evidence submitted after the hearing regarding King's alleged knee impairment.  Tr. 17.  Also, during the hearing, King's MRI and an x-ray of her knee were discussed.  Tr. 50-51.  Further, when discussing the medical evidence, the ALJ noted that King's knee examination at the consultative evaluation was unremarkable and she exhibited a normal gait and had full range of motion.  Tr. 20, 398, 400.  Also, when assessing King's RFC and summarizing the medical evidence, the ALJ stated, "I gave the claimant the benefit of the doubt with regard to her knee pain, though there is no severe knee impairment and her condition is expected to resolve with treatment."  Tr. 22.

As part of her Step Two argument, King takes issue with the ALJ's determination that King had the RFC to perform light work.  She argues that her disregarded knee impairment would preclude her from standing and/or walking for 6 hours each day and the ALJ should have limited her to sedentary work and found her disabled.  Doc. 15, pp. 9-10.   However, as discussed above, the ALJ did not disregard King's knee impairment.  Rather, based on consideration of all the evidence, including allegations and medical evidence regarding King's knee problems, the ALJ concluded that King had the RFC to perform a reduced range of light work.  Tr. 19-22.   In assessing King's RFC, the ALJ relied upon and gave great weight to opinion evidence from the state agency reviewing physician Dr. Gorniak (Tr. 21-22) who considered King's allegations of knee pain but nevertheless opined that King had the RFC to

perform light exertional work (Tr. 88).   Further, as noted by the ALJ, examination findings were generally normal and did not support the severity of limitations alleged by King.  Tr. 20.

Accordingly, even if it was determined that the ALJ incorrectly found  King's knee problems to be a non-severe impairment, the ALJ proceeded to subsequent steps in the sequential evaluation process and King has not shown that the ALJ failed to consider King's allegations with respect to her knee problems when assessing her RFC.  Thus, reversal and remand is not warranted based on the ALJ's Step Two determination.

**B.      The ALJ did not err at Step Three**

King argues that the ALJ did not properly evaluate her asthma under Listing 3.02 and her intellectual disability under 12.05(C) at Step Three.  Doc. 15, pp. 10-12; Doc. 19.

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 416.920(a)(4)(iii). The claimant bears the burden of establishing that her condition meets or equals a Listing. *Johnson v. Colvin*, 2014 U.S. Dist. LEXIS 50941, *7 (6th Cir. 2014) (citing *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987).   A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker v. SSA*, 93 Fed. Appx. 725, 728 (6th Cir. 2004).

**1.   Listing 3.02**

Relying on the one pulmonary function study in the record, which was performed as part of Dr. Duncan's consultative evaluation in October 2012, King contends that the ALJ erred in finding that her asthma did not meet or equal Listing 3.02(A) or 3.02(B).  Doc. 15, pp. 10-11. King argues that she satisfies Listing 3.02(A) because her FEV1 results were equal to or less

than the FEV1 value specified in Listing 3.02(A) for FEV1 for King's age, height and weight. Doc. 15, p. 10.  She also argues that she satisfies Listing 3.02(B) because her FVC results were equal to or less than the FVC value specified in Listing 3.02(B) for FVC for King's age, height and weight.  Doc. 15, p. 10.

Asthma, a chronic inflammatory disorder of the lung airways, is evaluated under Listing 3.02 or 3.03.  20 C.F.R. pt. 404, subpt. P, App. 1, pt. A1, § 3.00(I).  FEV1 and FVC are measured by spirometry.  20 C.F.R. pt. 404, subpt. P, App. 1, pt. A1, § 3.00(E)(1).

There are certain requirements under the listings with respect to a spirometry.  20 C.F.R. pt. 404, subpt. P, App. 1, pt. A1, § 3.00(E)(2).  For example, the claimant must be medically stable at the time of the test.  *Id.*  at § 3.00(E)(2)(a).  If the FEV1 is less than 70% of the claimant's predicted normal value, a repeat spirometry after inhalation of a bronchodilator is required to evaluate the claimant's respiratory disorder on the listings, unless it is contraindicated.  *Id.* at § 3.00(E)(2)(b).  If there is no post-bronchodilator spirometry, the test report shall explain why.  *Id.*  Also, the forced expiratory maneuvers must be satisfactory.  *Id.*  The spirometry report must include certain information, including factors that may affect the interpretation of the test results such as claimant's cooperation or effort in performing the test. *Id.* at § 3.00(E)(3).

The ALJ considered whether King's impairments met or equaled Listing 3.00.  Tr. 17. The ALJ concluded that the objective evidence failed to show that King's impairments satisfied the criteria and noted that no treating or examining physician had indicated findings that would satisfy the severity of the listings.  Tr. 17.   The ALJ noted her consideration of the opinions of the state agency reviewing physicians when evaluating King's impairments at Step Three.  Tr. 17.   Those physicians considered the pulmonary function study results but did not find a listing

level impairment.  *See e.g.,* Tr. 88-90 (Dr. Gorniak opinion finding that King was capable of a reduced range of light work).  King's FEV1 and FVC results may have fallen within the listing level range.  However, the October 18, 2012, spirometry report shows that the FEV1 results were between 43% and 49% of the predicted normal value. Tr. 405, 407.  Also, although post-bronchodilator studies were ordered (Tr. 394), no post-bronchodilator study was performed and no explanation was provided as to why a post-bronchodilator study was not performed (Tr. 394, 405, 407).  *See* 20 C.F.R. pt. 404, subpt. P, App. 1, pt. A1, § 3.00(E)(2)(b); *see e.g., Thacker*, 93 Fed. Appx. at 728 (discussing the requirements of post-bronchodilator tests).  Further, as set forth in § 3.00(E)(3)(b), factors that may affect interpretation of test results includes a claimant's effort.  In this case, the ALJ considered the spirometry report, noting that the report reflected that King provided suboptimal effort.  Tr. 20, 405.   In her reply brief, King points out that, while it was noted that she displayed suboptimal effort, the test nonetheless showed that she had a moderately severe restriction.  Doc. 19, p. 2.   However, the ALJ did not ignore this test result.  (Tr. 20 (acknowledging the spirometry findings, including a moderately severe restriction)) and King has not shown that the ALJ's reduced range of light work RFC did not adequately account for King's respiratory problems.

Upon consideration of the foregoing, the Court finds that King has not demonstrated that the ALJ's Step Three determination regarding Listing 3.02 is not supported by substantial evidence.

## 2.  Listing 12.05(C)

King argues that her mental impairment satisfies Listing 12.05(C).  Doc. 15, pp. 11-12.  Listing 12.05 relates to intellectual disability.[15]   King argues that "Listing 12.05C requires a

---

[15] Effective September 3, 2013, the Social Security Administration replaced the term Mental Retardation with Intellectual Disability. 78 FR 46499-01 (Aug. 1, 2013).

valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  It does not require anything more."   Doc. 15, p. 11.

King's statement as to what is required to satisfy 12.05(C) is incomplete because to qualify as disabled under that Listing, a claimant needs to satisfy both the diagnostic description in the introductory paragraph of Listing 12.05 and one of the four sets of criteria found in Subparts A through D.  20 C.F.R. § 416.925(c)(3);  *Foster v. Halter*, 279 F.3d 348, 354-355 (6th Cir. 2001).  The diagnostic description is as follows:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

In order to satisfy the diagnostic description, a claimant must prove that she meets three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 672, 675 (6th Cir. 2009) (citing *Foster*, 279 F.3d at 354).   "The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills."  *Hayes,* 357 Fed. Appx. at 677.

The additional Subpart C criteria are:

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1, Listing §12.05(C).

To argue that her mental impairment satisfies Listing 12.05(C), King points to Dr. Dubey's WAIS-IV test results, which includes a verbal IQ score of 70[16] (Tr. 385) and she contends that she has physical and mental impairments that impose additional and significant work-related limitation of function, including asthma, obesity, depressive disorder, and anxiety. Doc. 15, p. 11.  The ALJ considered Dr. Dubey's opinion, including the WAIS-IV test results. Tr. 21.  In doing so, the ALJ acknowledged the low WAIS-IV test scores and the consistency of those scores with a finding of mild mental retardation. Tr. 21.  However, the ALJ observed that Dr. Dubey concluded that the IQ test results were an underestimate of King's ability because of her poor effort and overall functioning on other aspects of the testing and offered a diagnosis of borderline intellectual functioning.  Tr. 21, 385, 389.   The ALJ gave "some weight to [Dr. Dubey's] opinion, insofar as the findings regarding [King's] ability to perform and persist at tasks is consistent with the overall record." Tr. 21.  The ALJ further explained that King's education records were "not supportive of a finding of a mild mental retardation or any problem with adaptive functioning. The claimant managed to secure employment for several years despite a history of special education."  Tr. 21.

As indicated, a <u>valid</u> verbal, performance, or full scale IQ of 60 through 70 is required to satisfy the Listing.  20 C.F.R. Part 404, Subpt. P, App. 1, Listing §12.05(C).   Here, Dr. Dubey concluded that the IQ scores were an underestimate of King's ability.  Tr. 385.  King contends that Dr. Dubey only questioned the full scale IQ scale, not the other scores which included a verbal IQ score of 70 and working memory score of 66.  Doc. 15, p. 11.   However, as discussed herein, even if King could establish a valid listing level IQ score, a valid listing level score is not the only component required for Listing 12.05(C).

---

[16] King also points to a Working Memory score of 66.  Doc. 15, p. 11.  However, the listing refers to a valid <u>verbal, performance, or full scale</u> IQ of 60 through 70, not a working memory score.  20 C.F.R. Part 404, Subpt. P, App. 1, Listing §12.05(C).

King also contends that Listing 12.05(C) does not require a diagnosis of intellectual disability.  She is correct.  However, the lack of a mental retardation diagnosis is an appropriate consideration when assessing whether an impairment satisfies Listing 12.05(C).  *See Peterson v. Comm'r of Soc. Sec.*, 552 Fed. Appx. 533, 539 (6th Cir. 2014) (citing *Cooper v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 450, 452 (6th Cir. 2007)).  Thus, the ALJ properly considered and gave some weight to Dr. Dubey's opinion, which included a diagnosis of borderline intellectual functioning, not intellectual disability.

Furthermore, as indicated above, the diagnostic description requires evidence of adaptive-skills limitations and, when assessing and weighing the evidence, the ALJ found and explained that King's education records were not supportive of a finding of mild mental retardation or any problem with adaptive functioning, noting that King was able to obtain employment notwithstanding a history of special education.  Tr. 21.  Thus, even if King could demonstrate the validity of her listing level verbal IQ score, she has failed to demonstrate evidence to satisfy the diagnostic description and/or show that the ALJ's finding of no problems with adaptive functioning was not supported by substantial evidence.  *See Hayes*, 357 Fed. Appx. at 677 ("The adaptive skills prong evaluates a claimant's effectiveness in the areas such as social skills, communication skills, and daily-living skills."); *see also Peterson*, 552 Fed. Appx. at 540 ("[N]either circumstantial evidence such as school records nor a history of special education combined with an adult IQ score are necessarily enough to demonstrate that a claimant had adaptive functioning deficits before age twenty-two.").

Based on the foregoing, the Court finds that King has not demonstrated that the ALJ's Step Three determination regarding Listing 12.05(C) is not supported by substantial evidence.[17]

---

[17] King's claim that reversal and remand is required on the basis that the ALJ did not consider all the restrictions contained in the state agency reviewing psychologists' opinions (Doc. 15, p. 12) is without merit.  The ALJ made

**C.      The ALJ properly assessed King's credibility**

King argues that the ALJ did not properly assess her credibility.  Doc. 15, pp. 12-14.

Social Security Ruling 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p")[18] and 20 C.F.R. § 416.929 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms.  First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 416.929(c); SSR 96–7p.

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's

_____

clear at Step Three (Tr. 17) and when assessing and weighing the medical opinion evidence (Tr. 21-22) that she considered the opinions of the state agency reviewers.  Moreover, an ALJ is not obligated to discuss every piece of evidence.  *Simons v. Barnhart,* 114 Fed. Appx. 727, 733 (6th Cir.2004) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (internal citations omitted).

[18]  SSR 96-7p was in effect on June 23, 2014, the date of the ALJ's decision.  Effective March 16, 2016, SSR 16-3p superseded SSR 96-7p.

demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Consistent with the Regulations, the ALJ considered King's allegations, stating:

> The record overall does not support the claimant's contention that her severe impairments are disabling; she does not have a residual functional capacity beyond that determined herein.

Tr. 20.

> Overall, the evidence of record does not support the claimant's subjective complaints.  The claimant's physical impairment is not disabling.  Her respiratory examinations are unremarkable, of late.  Her asthma is well-controlled with medication.  I gave the claimant the benefit of the doubt with regard to her knee pain, though there is no severe knee impairment and her condition is expected to resolve with treatment.  Moreover, the longitudinal record, including a review of the so-called "B" and "C" criteria does not support a disabling mental impairment.  The claimant has non-compliance issues, as noted above, including no follow through with mental health treatment or taking medication.  Both Greenleaf and Portage Path dismissed the claimant for failure to attend treatment.  She has gone to counseling, but she has never required any psychiatric hospitalization.  While the claimant may have reduced stress tolerance, which could impede her ability to perform complicated tasks or to engage in high levels of interpersonal interaction or in fast-paced work, there is no compelling evidence that she cannot perform the mental demands of simple routine tasks that are not fast-paced.  As set forth above, the claimant's mental limitations do not constitute a substantial loss of the ability to meet the basic mental demands of work within the meaning of Social Security Ruling 85-15.

Tr. 22.

King contends that the ALJ chose to ignore or give little weight to evidence supporting her subjective claims.  Doc. 15, p. 14.  The evidence that King contends that the ALJ ignored is King's hearing testimony regarding her inability to make proper change and that she could not help her grandchildren with their homework because she could not understand it.  Doc. 15, p. 14.

The ALJ did not ignore King's statements regarding her problems with math.  In fact, the ALJ specifically acknowledged that King indicated that she did shopping but was "not so good

with math." Tr. 19.  With respect to King's claim that the ALJ ignored evidence that she cannot assist her grandchildren with their homework, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."  *Simons,* 114 Fed. Appx. at 733.  Moreover, the ALJ accounted for mental impairment limitations in the RFC by limiting King to unskilled work; simple routine tasks in a static setting; no tasks with high production demands/quotas or with demand for fast pace; but having the ability to perform goal oriented work (Tr. 19) and King has failed to demonstrate that these limitations are not supported by substantial evidence.  For example, the mental RFC limitations are supported by Dr. Dubey's opinion (Tr. 390-391) and the opinions of the state agency reviewing psychologists (Tr. 90-92).  Tr. 21 (some weight assigned to Dr. Dubey's opinion); Tr. 21-22 (great weight assigned to state agency reviewing opinions).  *See Jones*, 336 F.3d at 477 ("Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ.").

The ALJ's decision makes clear that the ALJ fully considered the record and assessed the credibility of King's subjective statements and did not limit her credibility assessment to one piece of evidence.  Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis regarding the severity of King's impairments is supported by substantial evidence.  Accordingly, reversal and remand is not warranted based on the ALJ's credibility assessment.

**D.**     **The ALJ did not err at Step Five**

King contends that the ALJ's Step Five determination is not supported by substantial evidence because the ALJ should have relied upon the VE's responses to the hypothetical question containing a sedentary exertional level limitation.  Doc. 15, pp. 15-16.  King's Step Five argument amounts to a reiteration of her claim that the ALJ did not properly account for her knee impairment when assessing a light RFC.  Doc. 15, p. 16.  King's knee impairment claim was addressed above and no error was found.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible."  *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  Here, the ALJ relied upon the VE's response to a hypothetical question that accurately portrayed the RFC limitations that the ALJ found were supported by the record.  Accordingly, the ALJ's Step Five determination is supported by substantial evidence.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated:  February 2, 2017

Kathleen B. Burke
United States Magistrate Judge